IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GWENDOLYN RICE | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CARLOS DEL TORO, Secretary of the Navy | : | NO.   23-416 |
| | : | |

## MEMORANDUM

**Padova, J.**                                                    **August 27, 2024**

Plaintiff Gwendolyn Rice brings this action against Carlos Del Toro in his official capacity as Secretary of the Navy, her former employer, asserting claims of age discrimination, disability discrimination, and retaliation.   Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing that the record does not support a prima facie case of discrimination or retaliation.   For the reasons that follow, we grant Defendant's motion for summary judgment in its entirety.

## I.    BACKGROUND

The undisputed facts in the summary judgment record are as follows.   Plaintiff was a civilian employee of NAVSUP Weapon Systems Support, a component of the Navy responsible for sourcing fleet material and parts, for forty years until her retirement in 2019.   (Rice Dep., Ex. 1, at 8-9 of 39.)[1]   Born in 1959 (and therefore age 60 when she retired), Plaintiff is female and suffers from chronic back and neck pain, fibromyalgia, glaucoma, arthritis, carpel tunnel syndrome, high blood pressure, foot, ankle, and leg pain, and anxiety.   (Rice Aff., Ex. 20, at 5-7, 10 of 105.)   Beginning in 2016 and throughout the relevant time, Plaintiff's first line supervisor

---

[1] All exhibits referenced are those attached to Defendant's Motion for Summary Judgment.

was Kevin Gallagher, Acquisition Logistics Planning Branch Head; her second line supervisor was Ricky Neason, Life Cycle Division Director; and her third line supervisor was Clare Filipkowski, Integrative Logistics Support Deputy Department Head.   (Gallagher Aff., Ex. 23, at 5-6 of 54; Neason Dep., Ex. 4, 8-9 of 35; Filipkowski Dep., Ex. 5, at 8-9 of 49.)

As early as 2017, Plaintiff complained to her supervisors that others in the workplace were attempting to force her into retirement by mistreating her, stealing from her, and disrupting her workstation.   (See Gallagher Email, Ex. 17, at 2-3 of 3.)   In a March 24, 2017 email to Neason, Gallagher documented these and prior accusations by Plaintiff, all of which he reported had been investigated and determined to be unfounded.   (Id. at 2 of 3.)   In the same email, Gallagher expressed concerns about Plaintiff's performance, stating that Plaintiff "is often confused, very disorganized and quite often openly and suddenly hostile.   She is not given complex tasks to perform because she is, in my opinion, not up to the level of performance required."   (Id.) Nonetheless, throughout this time, Gallagher consistently rated Plaintiff's performance as "acceptable" under the evaluation system then in place, which permitted only acceptable/unacceptable ratings.   (Gallagher Dep., Ex. 3, at 16 of 61.)

Filipkowski testified that in July of 2018, she began to question how Plaintiff was spending her time and requested that Plaintiff report on her tasks and workload, which Plaintiff was unable to do satisfactorily.   (Ex. 5 at 25 of 49.)   Around the same time, Plaintiff's position description ("PD") was identified by Position Management as one of several needing revision.   (Bryan & Fanus Emails, Ex. 9, at 2-3 of 7.)   On August 7, 2018, Neason was tasked with updating Plaintiff's PD "to close some loopholes based on IG findings" and address missing information.   (Bryan Email, Ex. 9, at 2 of 7.)   Specifically, Neason was instructed to "beef up the body of the PD" by "combin[ing] tasks, add[ing] some language, and mak[ing] it fit the current template."   (Rowlands

Email, Ex. 9, at 2 of 7.)   The record shows that Plaintiff was aware of these efforts as early as October 15, 2018, when she expressed concern to her supervisors about signing her performance evaluation with a PD revision pending, and questioned the need to revise her PD in the first place. (Rice Email, Ex. 31, at 2 of 9.)   Despite Plaintiff's objections, the revision process continued. On November 8, 2018, after addressing various technical and formatting issues with the PD, Human Resources asked Neason to "re-write the duties clarifying the acquisition duties which must = 50% and re-identify the percentages of the rest of the duties."   (Hershman Email, Ex. 12, at 2-3 of 27.)   A little over a week later, Plaintiff again wrote to Filipkowski to express her opposition to a revised PD.   (Rice Email, Ex. 22, at 4-5 of 6.)   Plaintiff explained that she opposed the revision because prior attempted revisions by Gallagher had been unsuccessful, and because she feared that duties would be taken away from her and assigned to others, jeopardizing her grade level.   (Id. at 4 of 6.)   Nonetheless, she acknowledged that Neason had told her he would merely "make minor changes to the exiting PD . . . as discussed in prior meetings."   (Id. at 5 of 6.)   In the same email, Plaintiff expressed concerns about disparate treatment, retaliation, and inappropriate conduct by Gallagher, and the impact such conduct was having on her medical conditions.   (Id.)

On January 4, 2019, the friction between Plaintiff and Gallagher came to a head.   Plaintiff came into the office on one of her days off to address an urgent email.   (Ex. 20 at 55 of 105.) When she approached Gallagher to discuss the matter, she found him seated with his leg propped up and both legs open.   (Id. at 56 of 105.)   Plaintiff had expressed discomfort with Gallagher sitting that way on two prior occasions in 2017 and 2018 and viewed the behavior as sexual harassment.   (Id. at 58-61 of 105.)   On January 4, 2019, Gallagher criticized Plaintiff's response to the urgent email and the two became embroiled in a shouting match.   (Id. at 56-57 of 105; Ex.

23 at 33-35 of 54.)   The yelling attracted Filipkowski and her superior Tonya Cormier, who

separated Plaintiff and Gallagher and questioned them about the commotion.   (Ex. 5 at 12 of 49;

Ex. 20 at 57 of 105; Ex. 23 at 35 of 54.)   Filipkowski attempted to calm Plaintiff, but Plaintiff

began shouting again, which she viewed as disrespectful and insubordinate.   (Ex. 5 at 13 of 49.)

Following this incident, Filipkowski directed Neason to issue a formal letter of reprimand to

Plaintiff, but Neason persuaded her that a verbal warning was sufficient.   (Ex. 23 at 38 of 54;

Neason Aff., Ex. 2, at 20 of 64.)   On January 8, 2019, Plaintiff received a verbal warning from

Neason for being "rude and disrespectful" towards Filipkowski.   (Ex. 2 at 20-21 of 64; Ex. 20 at

57 of 105.)

On January 30, 2019, Gallagher and Plaintiff met for Plaintiff's annual progress review,

with Neason observing.   (Gallagher Email, Ex. 18, at 2 of 3.)   Gallagher encouraged Plaintiff to

"show more initiative and leadership" by developing trainings and production metrics and by

intensifying her customer outreach.   (Id.)   Plaintiff testified that Gallagher's criticism and

negativity caused others in the office to treat her poorly.   (See Ex. 20 at 25-26 of 105.)

Specifically, she testified that coworkers ignored her and excluded her from social events like

lunches and parties.   (Id.)   One coworker who was asked to assist her complained that he was not

her "private secretary."   (Rice Dep., Ex. 29, at 36.)   Plaintiff also testified that throughout this

time, her requests for technical and logistics training, as well as internal trainings called

Knowledge Transfer Events, went ignored by Gallagher.   (Ex. 20 at 34-35 of 105.)   On February

7, 2019, Plaintiff was passing Gallagher's desk after he had left for the day and happened to see a

magazine article about murder, which she perceived as a threat in light of their previous

confrontations.   (Ex. 20 at 88-90 of 105.)   She reported the incident to Captain York, a senior

officer, as well as Neason and her union.   (Id. at 90.)   Gallagher testified that he brought in the

4

article, which was about false confessions, to discuss with a colleague who had a background in policing.   (Ex. 3 at 44 of 61; see also Memories of a Murder Article, Ex. 32.)   Around this same time, Plaintiff testified that she overheard Gallagher utter the words "that bitch," which she believed were directed at her since she had just sent an email contradicting him to Neason.   (Ex. 20 at 85-87 of 105.)

On March 9, 2019, Plaintiff broke her ankle and received permission to telework full time. (Ex. 1 at 35 of 39.)   The next day, during a status call with Gallagher and Neason, Gallagher loudly criticized Plaintiff, exacerbating her medical conditions.   (Ex. 20 at 42 of 105.)   In March 2019, Gallagher rated Plaintiff "Satisfactory" under the new performance evaluation rubric, which permitted ratings of Unsatisfactory, Satisfactory, and Outstanding.   (Ex. 3 at 16 of 61.) Nonetheless, he made extensive comments on Plaintiff's appraisal form, noting "a need for improvement" on each evaluation element.   (Rice 2019 Performance Appraisal, Ex. 16, at 6-8 of 8.)   On April 10, 2019, following a telephone conference with Gallagher and Neason, Plaintiff again suffered debilitating pain and stress brought on by criticism from Gallagher, and had to go to the Emergency Room.   (Rice Email, Ex. 11, at 3 of 7; Ex. 29 at 75.)   Plaintiff made her initial Equal Employment Opportunity ("EEO") contact that day and began to look into retirement.   (Ex. 29 at 75; EEO Counselor's Report, Ex. 15, at 2 of 8.)

On May 1, 2019, Plaintiff's revised PD was approved.   (Ex. 23 at 10 of 54.)   Neason testified that because Plaintiff was on telework or leave at the time, he instructed Gallagher to email the position description to her along with a Family Medical Leave Act ("FMLA") form that she had requested.   (Ex. 2 at 9 of 64; Neason Email, Ex. 14, at 2 of 16; Gallagher Email, Ex. 8, at 2, 8-12 of 20.)   Plaintiff was on FMLA leave from May 8 through June 11, 2019, after which time she was again approved for full-time telework.   (Ex. 15 at 5 of 8; Neason Email, Ex. 26, at 4-5 of

6.)   Plaintiff reported on June 13, 2019 that she was "[i]n the process of reviewing the PD."   (Rice email, Ex. 26 at 2 of 6.)   Plaintiff, Neason, and Gallagher held a telephone conference about the revised PD the next week and scheduled a formal meeting to discuss the revisions on June 24, 2019 at 9:00 a.m.   (Ex. 20 at 17 of 105; Neason Email, Ex. 21; Ex. 23 at 10 of 54.)   At these meetings, Plaintiff requested training on the new PD, but Gallagher and Neason denied her request, insisting that she did not need training because the duties involved were the same ones she had been performing for years.   (Ex. 20 at 17-18 of 105.)   Immediately following the June 24th meeting, at 10:20 a.m., Gallagher learned of Plaintiff's EEO complaint when an EEO investigator contacted him for an interview.   (Bell Email, Ex. 6.)   Two days later, on June 26th, Plaintiff received a Notice of Unacceptable Performance dated June 24, 2019, the day Gallagher had learned of her EEO complaint.[2]   (Ex. 20 at 79 of 105.)   Plaintiff met with Neason, Gallagher, and a Labor Relations representative that day, and was told that that she would receive a poor performance rating if she did not improve within thirty days.   (Id. at 81-82 of 105; Ex. 3 at 29-30 of 61.)   One or two days later, the notice was rescinded following an inquiry by Plaintiff's union.   (Ex. 20 at 80 of 105; Ex. 2 at 26 of 64.)   On July 22, 2019, Plaintiff formally notified her employer of her intent to retire the following month.   (Notification of Personnel Action, Ex. 19.)

That same day, Plaintiff filed a formal EEO complaint in connection with this matter.   (Ex. 24, at 2 of 10).   Following an investigation, summary judgment was entered in Defendant's favor at the administrative level on September 26, 2022.   (See Order Entering Judgment, Ex. 28.)   Plaintiff subsequently filed a Complaint in this Court on February 1, 2023, asserting disability

---

[2] This notice is variously referred to in the record as a letter of warning and a performance evaluation.

discrimination and retaliation claims under the Rehabilitation Act, 29 U.S.C. § 701 et seq.,[3] age

discrimination and retaliation claims under the Age Discrimination in Employment Act, 29 U.S.C.

§ 621 et seq. (the "ADEA"), and sex discrimination and retaliation claims under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII").   In an Order dated May 23,

2023, we dismissed Plaintiff's sex discrimination claim for failure to timely exhaust.

Following discovery, Defendant filed a motion for summary judgment pursuant to Rule

56.   We approved two stipulated extensions for Plaintiff to respond to the motion, ultimately

extending the deadline to April 12, 2024.   Nearly three months later, on July 10, 2024, the day

before oral argument, Plaintiff filed a response.   At oral argument, Plaintiff made what we

construe as a motion to consider her response *nunc pro tunc*.   We granted Defendant two weeks

to respond to Plaintiff's *nunc pro tunc* motion and/or the belated response.   Defendant filed a

reply on July 25, 2024, asserting that Plaintiff's response should be stricken as untimely.[4]

Defendant also addressed the merits of Plaintiff's response, maintaining that summary judgment

---

[3]  The Complaint references the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA"), but it is the Rehabilitation Act that prohibits disability discrimination by federal employers like Defendant, whereas the ADA applies to non-federal entities.   See Taibi v. Borough of Slatington, Civ. A. No. 18-385, 2018 WL 6173366, at *3 (E.D. Pa. Nov. 26, 2018) (quoting Shiring v. Runyon, 90 F.3d 827, 830 (3d Cir. 1996)).   In any case, the "substantive standards for determining liability [under either act] are the same." Laguna v. Chester Hous. Auth., 616 F. Supp. 3d 462, 467 (E.D. Pa. 2022) (quoting McDonald v. Commonwealth of Pa., Dep't of Pub. Welfare, Polk Ctr., 62 F.3d 92, 95 (3d Cir. 1995)).

[4]  Defendant also asked that we deem his full statement of facts undisputed for purposes of the motion for summary judgment, arguing that Plaintiff's response to those facts was untimely and inadequate.   Rule 56 provides that if a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).   As considering Defendant's full statement of facts undisputed would not alter our disposition of the motion for summary judgment, we have declined to do so.

is warranted regardless.   We now grant Plaintiff's motion to consider her response *nunc pro tunc*,[5] and proceed to consideration of the summary judgment motion.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."

---

[5] Our local rules provide that a party has fourteen days to file an opposition to a motion, a period that may be extended "for good cause" prior to its expiration pursuant to Federal Rule of Civil Procedure 6.   See E.D. Pa. L. Civ. R. 7.1(c); Fed. R. Civ. P. 6(b)(1)(A).   When a party moves for an extension *after* the deadline has passed, we may grant the extension "for good cause" only if the party establishes "excusable neglect."   Fed. R. Civ. P. 6(b)(1)(B).   In assessing excusable neglect, we consider "all relevant circumstances."   Drippe v. Tobelinski, 604 F.3d 778, 785 (3d Cir. 2010) (citation omitted) (quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs., 507 U.S. 380, 395 (1993)).   "These include . . . the danger of prejudice . . . , the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith."   Id. (alterations in original) (citation omitted) (quoting Pioneer, 507 U.S. at 395).   "The determination of whether neglect is excusable 'is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission."   Ragguette v. Premier Wines & Spirits, Ltd., 424 F. App'x 155, 156 (3d Cir. 2011) (quoting Pioneer, 507 U.S. at 395).

Plaintiff's counsel has offered meager justification for his substantial delay in filing a response to the motion for summary judgment, which might have been foregone entirely had we not scheduled oral argument *sua sponte*.   At oral argument, his only explanation was that he had been busy and hadn't realized that he had never responded to Defendant's motion.   He also admitted that he had finished the response over a week prior despite only filing it the day before. Moreover, Plaintiff's counsel has displayed a pattern of similar dilatoriness throughout this case, as noted by Defendant at oral argument.   Nonetheless, Defendant does not assert that he was prejudiced by the delay and there is no suggestion that Plaintiff's counsel acted in bad faith. Additionally, given the dispositive nature of Defendant's motion, it is preferable that Plaintiff have the opportunity to frame her own opposition and not be penalized for her counsel's lack of diligence.   Cf. Hill v. Williamsport Police Dep't, 69 F. App'x 49, 51 (3d Cir. 2003) (citations omitted) (describing, in the default judgment context, the preference for adjudication on the merits).   Accordingly, while we do not condone the conduct of Plaintiff's counsel, we nonetheless grant Plaintiff's motion to consider her response *nunc pro tunc*.

Id.  In ruling on a summary judgment motion, we "construe the evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion." Jacobs v. Cumberland Cnty., 8 F.4th 187, 192 (3d Cir. 2021) (citing Bland v. City of Newark, 900 F.3d 77, 83 (3d Cir. 2018)).  However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010) (citing Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1).  "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler Cnty. Fam. YMCA, 418 F.3d 265, 267 (3d Cir. 2005)).  Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at

322.   If a reasonable fact finder could find in the nonmovant's favor, summary judgment may not

be granted.  Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 130-31 (3d Cir. 2002)

(citation omitted).

## III.   DISCUSSION

### A.   Age and Disability Discrimination

Plaintiff contends that Defendant discriminated against her on the basis of age and

disability.   The ADEA makes it unlawful to "discriminate against any individual with respect to

his compensation, terms, conditions, or privileges of employment, because of such individual's

age."   29 U.S.C. § 623(a)(1).   The Rehabilitation Act similarly "forbids federal employers from

'discriminating against persons with disabilities in matters of hiring, placement, or advancement.'"

Manolopoulos v. DeJoy, Civ. A. No. 21-3962, 2023 WL 1766264, at *5 (E.D. Pa. Feb. 3, 2023)

(quoting Shiring v. Runyon, 90 F.3d 827, 830-31 (3d Cir. 1996)) (citing 29 U.S.C. § 701 et. seq.).

Under both Acts, a plaintiff lacking direct evidence of discrimination, as is the case here, may still

make out a discrimination claim based on circumstantial evidence under the burden-shifting

framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[6]  Mitchell v.

Univ. of Pittsburgh, No. 22-2876, 2023 WL 8596653, at *1 (3d Cir. Dec. 12, 2023) (citing Willis

v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015)); see also Lynch v. Su,

Civ. A. No. 22-0091, 2024 WL 263928, at *5 (E.D. Pa. Jan. 24, 2024) (citing Wishkin v. Potter,

476 F.3d 180, 185 (3d Cir. 2007)) (applying McDonnell Douglas framework to ADEA and

---

[6]  The McDonnell Douglas framework applies equally to cases involving claims of
workplace discrimination under Title VII.   See Wishkin, 476 F.3d at 185 ("[T]he ADA, ADEA
and Title VII all serve the same purpose—to prohibit discrimination in employment against
members of certain classes.   Therefore, it follows that the methods and manner of proof under one
statute should inform the standards under the others as well."  (quotation omitted)).   Thus, Title
VII cases may inform our analysis here.   Id.

Rehabilitation Act claims).

At the first stage of the <u>McDonnell Douglas</u> analysis, the plaintiff has the burden of establishing a prima facie case of discrimination by a preponderance of the evidence. <u>Manolopoulos</u>, 2023 WL 1766264, at *6 (citing <u>Shaner v. Synthes</u>, 204 F.3d 494, 500 (3d Cir. 2000); <u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003)).   The plaintiff's prima facie case creates a presumption of discrimination, which the defendant can rebut by proffering a "legitimate, nondiscriminatory reason" for the challenged conduct.   <u>Sarullo</u>, 352 F.3d at 797 (quoting <u>McDonnell Douglas</u>, 411 U.S. at 802) (citing <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 255 (1981)).   The plaintiff must then offer evidence to show that the proffered reason is pretextual.   <u>Id.</u> (citing <u>Burdine</u>, 450 U.S. at 253; <u>McDonnell Douglas</u>, 411 U.S. at 804).

To make out a prima facie case of employment discrimination, the plaintiff must establish that she: (1) is a member of a protected class, (2) was qualified for the position she held, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination.   <u>Id.</u> (citing <u>McDonnell Douglas</u>, 411 U.S. at 802) (add'l citation omitted).

Only the third and fourth elements of Plaintiff's prima facie case are in dispute.   The record establishes that Plaintiff was part of a protected class based on age, and Defendant does not contest that Plaintiff's medical conditions constitute disabilities, or that she was qualified for her position.   (<u>See</u> Ex. 20 at 6-7, 10 of 105); <u>see also</u> 29 U.S.C. § 631(a) (applying ADEA protections to "individuals who are at least 40 years of age").   Rather, Defendant argues that Plaintiff cannot establish that she suffered an adverse employment action under circumstances giving rise to an inference of discrimination.

An adverse employment action is "an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'"

Lynch, 2024 WL 263928, at *6 (quoting Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004)).   It entails "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."   Remp v. Alcon Lab'ys., Inc., 701 F. App'x 103, 106-07 (3d Cir. 2017) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).   In contrast, actions without tangible employment consequences, such as reprimands or even suspensions with pay, do not rise to the level of adverse employment actions.   See id. at 107 (citations omitted).   An inference of discrimination is most commonly supported by comparator evidence, which is "evidence that [the employer] treated 'similarly situated' individuals not within plaintiff's protected class more favorably than it treated plaintiff."   Lynch, 2024 WL 263928, at *6 (alteration in original) (quoting Darby v. Temple Univ., 216 F. Supp. 3d 535, 542 (E.D. Pa. 2016)). However, it may also be supported by other forms of proof, such as evidence of similar discrimination against other employees, or statements or actions directly suggesting animus.   Id. (quoting Golod v. Bank of Am. Corp., 403 F. App'x 699, 702 n.2 (3d Cir. 2010)).

1.   Negative Behavior of Coworkers and Supervisor

Plaintiff argues that her supervisor discriminated against her on the basis of age and/or disability by acting rudely and critically towards her and encouraging others in the office to do the same.   There is no evidence in the record, however, that the snubs of Plaintiff's coworkers or Gallagher's own unpleasantness, including addressing Plaintiff loudly and disrespectfully, adopting postures that offended her, and once referring to her as "that bitch," had any impact tangible enough to qualify as adverse employment actions.[7]   Cf. Ackie v. Phila. Gas Works, Civ.

---

[7] In her response, Plaintiff makes no attempt to refute Defendant's argument that the incidents she cites in support of her claims are not adverse actions.   Nevertheless, out of an abundance of caution, we analyze those arguments here.

A. No. 19-4275, 2021 WL 2375876, at *17 (E.D. Pa. June 10, 2021) ("[M]ere 'unpleasantness' in the workplace does not constitute an adverse employment action." (quotation omitted)); Wesley v. PNC Bank, Civ. A. No. 19-5052, 2020 WL 7319548, at *5 (E.D. Pa. Dec. 11, 2020) (collecting cases concluding that "unnecessary derogatory comments do not rise to the level of adverse employment actions" (quotation omitted)).   Similarly, there is no evidence that Gallagher attaching Plaintiff's revised position description to the same email as her requested FMLA paperwork had a tangible impact on Plaintiff's employment.   Thus, none of these incidents can support a prima facie case of age or disability discrimination.

2.   Denial of Training

Plaintiff next argues that her employer discriminated against her on the basis of age and disability by denying her training.   Plaintiff testified that, throughout Gallagher's tenure and specifically at the time when her position description was revised, she was denied training, including "refresher courses in certain software" and "technical and logistic trainings."   (Ex. 29 at 41; Ex. 20 at 35 of 105.)   "[A]n employer's denial of a training request, without something more, is not itself an adverse employment action."   Cross v. Postmaster Gen. of United States, 696 F. App'x 92, 95 (3d Cir. 2017) (quoting Clegg v. Ark. Dep't of Corr., 496 F.3d 922, 928 (8th Cir. 2007)).   However, a denial of training that has a tangible impact on the employee's advancement or earning potential may rise to the level of an adverse employment action.   See Jones v. Gemalto, Inc., Civ. A. No. 11-6902, 2013 WL 1194518, at *8 (E.D. Pa. Mar. 25, 2013), aff'd, 560 F. App'x 119 (3d Cir. 2014).

Here, there is no evidence in the record that Plaintiff suffered any tangible impact as a result of being denied training.   When asked how the denial of training harmed her, Plaintiff

testified only that she "wasn't able to keep up with the latest and greatest information and changes" and that she had to work late on unspecified occasions.  (Ex. 20 at 19, 37 of 105.)   She denied that withheld technological training impacted her ability to perform her duties and forced her to retire, speculating only that it "would have" at some future time.  (Id. at 20 of 105.)   Because there is no evidence in the record that the denial of training had a serious and tangible impact on Plaintiff's employment or career advancement, Plaintiff has failed to make a factual showing to support her claim that the denial of training constituted an adverse employment action.   See Ford v. Cnty. of Hudson, 729 F. App'x 188, 195 (3d Cir. 2018) ("The denial of an opportunity to become marginally more efficient in the execution of her duties does not constitute an adverse employment action, particularly where no evidence in the record suggests that any conditions or privileges of her employment were affected as a result." (citation omitted)); Paradisis v. Englewood Hosp. Med. Ctr., 680 F. App'x 131, 136 (3d Cir. 2017) (concluding that denial of training was not an adverse employment action because plaintiff's qualifications were not at issue and she was "not otherwise reprimanded, docked pay, suspended, or terminated due to her failure to receive such training"); Rajendran v. Wormuth, Civ. A. No. 22-581, 2024 WL 1356701, at *13 (M.D. Pa. Mar. 29, 2024) (concluding that denial of training that made employee's work take longer was not an adverse employment action).

      3.    Revised Position Description

Plaintiff also contends that the revision of her position description in May of 2019 constituted disability discrimination.  The Supreme Court has stated that "reassignment with significantly different responsibilities" can constitute an adverse employment action.   See Remp, 701 F. App'x at 106-07 (quoting Burlington, 524 U.S. at 761).   However, an increase in workload alone is generally not an adverse employment action unless it seriously and tangibly affects the

terms and conditions of employment.   See Robinson v. N. Am. Composites, Civ. A. No. 15-8702, 2017 WL 2443056, at *6 (D.N.J. June 6, 2017) (collecting cases).   "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action."   Homel v. Centennial Sch. Dist., 836 F. Supp. 2d 304, 323 (E.D. Pa. 2011) (quoting Clegg v. Ark. Dep't of Corr., 496 F.3d 922, 926 (8th Cir.2007)); see also Dominici v. Reading Hosp./Tower Health, Civ. A. No. 18-4181, 2020 WL 2898658, at *16 (E.D. Pa. June 3, 2020) (assignment to different, less desirable duties, without reduction in pay or status, was not an adverse employment action).

There is no evidence in the record that the revision of Plaintiff's position description altered her grade, salary, benefits, or working conditions, or that her role was otherwise diminished. Moreover, there is uncontradicted testimony from Plaintiff's third-line supervisor Clare Filipkowski that the revised description would not have impacted any promotion prospects or otherwise "impeded [Plaintiff] in any way."   (Ex. 5 at 37-38 of 49.)   Plaintiff did testify that the revised PD included new duties and duties she had not performed in years (Ex. 20 at 14-16 of 105), though the record is unclear as to whether these constituted significantly different responsibilities or more minor changes.

Regardless, even if the revision of Plaintiff's position description was adverse, there is no evidence in the record that would support an inference of discrimination.   Plaintiff proffers no "evidence of similar discrimination of other employees, or . . . statements or actions by [her] supervisors suggesting animus" in the context of the revision.   Lynch, 2024 WL 263928, at *6 (second alteration in original) (quoting Golod, 403 F. App'x at 702 n.2).   As for comparator evidence, Gallagher testified that when he became branch supervisor in 2016, he began the process of reviewing and revising the position descriptions of all of his subordinates, though he delayed

revising Plaintiff's due to her objections.  (Ex. 23 at 6, 13-14 of 54.)  Plaintiff testified that the procedure for revising a PD consisted of sending the new PD to the employee in hard copy or by email and then meeting with them to discuss the revisions.  (Ex. 20 at 10-11 of 105.)  She also testified that this was exactly what occurred in her case—she received the new position description by email, and her supervisors then scheduled a meeting with her to go over it "line by line."  (Id. at 11 of 105.)  While Plaintiff contends that others received preferential treatment such as extra training during this process, she concedes that this is mere speculation because she was out of the office working remotely and thus "cannot say if they did or didn't."  (Id. at 12-13, 22 of 105.)  Likewise, Plaintiff's speculation that Gallagher acted as he did to deliberately trigger her health conditions is wholly unsubstantiated by the record.  In short, the record does not support a reasonable conclusion that Plaintiff was singled out or that the revision of her position description was motivated by animus.  Accordingly, Plaintiff cannot make out a prima facie case of discrimination based on the revision of her position description.

### 4.   Notice of Unacceptable Performance

Finally, Plaintiff argues that Defendant discriminated against her by issuing her a Notice of Unacceptable Performance.  The record reflects that in late June of 2019, Plaintiff received a Notice of Unacceptable Performance warning of potential disciplinary action, which was then rescinded a day or two later.  (Id. at 79, 80-82 of 105.)  A warning of future disciplinary consequences, without more, does not constitute an adverse employment action.  See Sconfienza v. Verizon Pennsylvania Inc., 307 F. App'x 619, 622 (3d Cir. 2008) (explaining that "warning about future penalties" that initiated progressive discipline but did not impact employment, compensation, or advancement was not an adverse employment action); Deans v. Kennedy House, Inc., 587 F. App'x 731, 734 (3d Cir. 2014) (quotation and citation omitted) (concluding that oral

16

and written warnings were not adverse employment actions where they were not permanently noted in employee's file and did not otherwise impact terms and conditions of employment). While Plaintiff testified that she was warned of a negative performance review should she fail to improve, there is no evidence in the record that Plaintiff suffered any employment consequences from the notice itself or that any future consequences came to pass.   When asked how she was harmed by the notice, Plaintiff testified only that she "became upset" and that her fibromyalgia and foot pain "heightened."   (Ex. 20 at 82 of 105.)   There is also no evidence that the notice became part of Plaintiff's personnel file, and in fact, Neason testified that it no longer exists.   (Ex. 2 at 26-27 of 64.)   Because the only reasonable inference to be drawn from the facts in the summary judgment record is that the notice Plaintiff received did not affect the terms and conditions of her employment, Plaintiff has failed to establish that receipt of the Notice of Unacceptable Performance constituted an adverse employment action.

Courts in this circuit have also concluded that an employment action that is rescinded without tangible consequences is not an adverse employment action.   See Lanza v. Donahoe, Civ. A. No. 10-6737, 2013 WL 5477160, at *6 (D.N.J. Sept. 30, 2013) ("[D]istrict courts in this Circuit have held that a rescinded or unenforced employment decision does not constitute an adverse employment action." (citations omitted)), aff'd sub nom. Lanza v. Postmaster Gen. of U.S., 570 F. App'x 236 (3d Cir. 2014); McCall v. City of Philadelphia, Civ. A. No. 11-5689, 2013 WL 5823873, at *15 n.6 (E.D. Pa. Oct. 29, 2013) ("Several courts have concluded that proposed or rescinded terminations do not constitute an adverse employment action." (citations omitted)), aff'd, 629 F. App'x 419 (3d Cir. 2015).   Here, the record reflects that the notice was rescinded in a matter of days.   For this additional reason, the record cannot reasonably support the conclusion that it constituted an adverse employment action.

As the record does not support the reasonable conclusion that Plaintiff suffered an adverse employment action under circumstances giving rise to an inference of discrimination, Plaintiff cannot make out a prima facie case of discrimination.   Accordingly, summary judgment is granted in favor of Defendant and against Plaintiff on Plaintiff's claims of disability and age discrimination.[8]   See Celotex, 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case[.]"); Vierra v. Wayne Mem'l Hosp., 168 F. App'x 492, 495 (3d Cir. 2006) (agreeing with the district court that "[b]ecause [the plaintiff] could not show a prima facie case of . . . discrimination, summary judgment should be granted").

B.  Retaliation

Plaintiff also claims that Defendant retaliated against her for prior EEO activity and internal complaints of discrimination in violation of Title VII, the ADEA, and the Rehabilitation Act. "Both Title VII and the ADEA 'make it unlawful for an employer to retaliate against an employee for either opposing any practice made unlawful by their respective provisions or for participating in any manner in an investigation, proceeding, or hearing under their respective provisions.'" Smith v. DeJoy, Civ. A. No. 21-706, 2022 WL 16950447, at *6 (W.D. Pa. Nov. 15, 2022) (quoting Griffiths v. Nielsen, Civ. A. No. 15-2586, 2018 WL 1469051, at *12 (D.N.J. Mar. 23, 2018)). The Rehabilitation Act similarly "prohibits employers from punishing individuals who have 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

---

[8] For the first time in her response and at oral argument, Plaintiff asserts that she was forced to retire by the cumulative impact of Gallagher's treatment, essentially raising a new constructive discharge claim.   We decline to address this novel theory, which is not properly before us.   See Laurie v. Nat'l Passenger R.R. Corp., 105 F. App'x 387, 392-93 (3d Cir. 2004) (collecting cases rejecting new claims or legal theories raised for the first time in response to summary judgment motions).

hearing' related to disability discrimination." Id. (quoting Mastrella v. DeJoy, Civ. A. No. 20-1037, 2021 WL 5396076, at *5 (M.D. Pa. Nov. 18, 2021)). Like discrimination claims, retaliation claims based on indirect evidence are subject to the McDonnell Douglas burden shifting framework, and the plaintiff bears the initial burden of establishing a prima facie case. See Moore v. City of Philadelphia, 461 F.3d 331, 340-42 (3d Cir. 2006). To make out a prima facie case of retaliation under Title VII, the ADEA, or the Rehabilitation Act, a plaintiff must establish that: (1) she engaged in activity protected by the relevant statute; (2) her employer took a materially adverse action against her; and (3) a causal connection exists between the protected activity and the adverse action. See id. at 340-41 (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)); Lynch, 2024 WL 263928, at *10 (citation omitted) (applying the same framework to Title VII, ADEA, and Rehabilitation Act claims).

Defendant does not dispute that Plaintiff engaged in activity protected by Title VII, the ADEA, or the Rehabilitation Act. Rather, Defendant argues that there is no evidence in the record that Plaintiff suffered a materially adverse action with a causal link to her protected activity.

A materially adverse action for retaliation purposes is "not coterminous" with an adverse employment action for discrimination purposes. See Moore, 461 F.3d at 341 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006)). Specifically, material adversity is not limited to conduct that affects the terms and conditions of employment, but more broadly encompasses any action by an employer that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (quoting Burlington Northern, 548 U.S. at 68). "[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." Burlington Northern, 548 U.S. at 69. Thus, while the impact of a materially adverse action need not be strictly employment-related, there must still be some

tangible impact sufficient to dissuade protected activity.   See id. (contrasting exclusion from a social lunch to exclusion from a training lunch, and contrasting a schedule change for an average worker to a schedule change for a working parent).   A materially adverse action may be causally linked to an employee's protected activity by a "broad array of evidence" such as inconsistent explanations for the action, a pattern of antagonism following the protected activity, or temporal proximity between the protected activity and the action.   See Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 260 (3d Cir. 2017) (citations omitted) (quoting Marra v. Phila. Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007)).

1.   "Bitch" Comment

Plaintiff contends that Gallagher retaliated against her when he uttered "that bitch" after Plaintiff contradicted him in an email to Neason.   While a materially adverse action is broader than an adverse employment action, we must still "separate significant from trivial harms." Moore, 461 F.3d at 346 (quoting Burlington Northern, 548 U.S. at 68).   "'[P]etty slights, minor annoyances, and a simple lack of good manners' are normally not sufficient to deter a reasonable person." Hare v. Potter, 220 F. App'x 120, 128 (3d Cir. 2007) (alteration in original) (quoting Burlington Northern, 548 U.S. at 68).   Plaintiff testified that the "bitch" remark was in response to an email between her, Gallagher, and Neason in which she contradicted Gallagher, not a complaint of discrimination.   (Ex. 20 at 85-86 of 105.)   Moreover, even if the remark was in reference to Plaintiff, there is no evidence it was directed at Plaintiff, who was seated two desks away and on the other side of a partition.   (Ex. 1 at 23 of 39.)   We cannot conclude that overhearing a single, isolated use of crude epithet by a supervisor would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." Moore, 461 F.3d at 341 (quotation omitted). Therefore, this incident cannot support a prima facie case of retaliation.

2.    <u>Notice of Unacceptable Performance</u>

Plaintiff also argues that issuance of the June 2024 Notice of Unacceptable Performance constituted retaliation.   Courts in this circuit have held that this type of disciplinary action warning of future consequences might dissuade a reasonable employee from engaging in protected activity. See <u>Rejniak v. Brennan</u>, Civ. A. No. 17-1182, 2019 WL 5212592, at *8 (W.D. Pa. Oct. 16, 2019) (collecting cases); <u>see also</u> <u>Fields v. Am. Airlines, Inc.</u>, 696 F. Supp. 3d 66, 96 n.20 (E.D. Pa. 2023) (explaining that courts have more often found a letter of warning to suffice under the broader material adversity standard than the more narrow adverse employment standard); <u>but see</u> <u>Kasper v. Cnty. of Bucks</u>, 514 F. App'x 210, 216 (3d Cir. 2013) (applying material adversity standard in the FMLA context and concluding that warning that merely required employee to complete a minor task, even with prospect of future discipline, was not materially adverse).

Even assuming that the Notice of Unacceptable Performance was materially adverse, the evidence in the record does not support a reasonable inference that there was a causal connection between the notice and Plaintiff's protected activity.   Although the notice was issued on June 24, 2019, the same day Gallagher learned of Plaintiff's EEO activity, the undisputed evidence in the record is that Gallagher had been working on it prior to that date.   Gallagher testified that the genesis of the notice was his growing concern about Plaintiff's performance throughout 2019, which is documented in Plaintiff's January 2019 performance appraisal and Gallagher's notes on Plaintiff's April 2019 status report.   (Ex. 3 at 26-27 of 61; Ex. 18; Ex. 25 at 2-3.)   Prior to issuing the notice, he consulted with Labor Relations about how best to address Plaintiff's performance issues.   (Ex. 3 at 27-28 of 61.)   After deciding to issue a warning letter, he also consulted with both Neason and Filipkowski to ensure that both were on board with his chosen course of action. (<u>Id.</u> at 28 of 61; Ex. 2 at 26 of 64; Ex. 5 at 28 of 49.)   Finally, the notice itself was drafted and

approved by Labor Relations.   (Ex. 3 at 51 of 61; Ex. 23 at 44-45 of 54.)   Given this uncontroverted evidence, the mere fact that the notice was issued on June 24th does not support a causal connection between the notice and Plaintiff's 2019 EEO complaint.   See Burlington Northern, 548 U.S. at 69 (2006) ("[T]he significance of any given act of retaliation will often depend upon the particular circumstances.   Context matters.").

Plaintiff also attempts to link the notice to informal complaints of discrimination she made to Neason and others, most recently on April 26, 2019, two months before the Notice of Unacceptable Performance was issued.   (Ex. 20 at 70 of 105.)   Plaintiff asserts that this temporal proximity alone establishes a causal connection between the Notice and Plaintiff's protected activity.   However, as the United States Court of Appeals for the Third Circuit has explained, "a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive" and specifically, a period of two months "is not unusually suggestive."   See Blakney v. City of Philadelphia, 559 F. App'x 183, 186 (3d Cir. 2014) (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000); Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004)) (add'l citation omitted).   As supplementary evidence, Plaintiff contends that Gallagher never documented any concerns about Plaintiff's performance prior to issuing the notice, discrediting his asserted motive.   In fact, as detailed above, there is ample evidence in the record of Gallagher's concerns, as early as March 2017 and over the course of 2019.   (See Ex. 3 at 26-27 of 61; Ex. 17 at 2 of 3; Ex. 18; Ex. 25.)   Because the record does not support the reasonable conclusion that there was a causal connection between the Notice of Unacceptable Performance and Plaintiff's protected activity, Plaintiff cannot make out a prima facie case of retaliation based on the notice.

We conclude that Plaintiff has failed to make out a prima facie case of retaliation as the

record does not support the reasonable conclusion that she suffered a materially adverse action causally connected to her protected activity.    Accordingly, we grant summary judgment in favor of Defendant on Plaintiff's retaliation claims.    See Celotex, 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case[.]"); Kengerski v. Harper, 6 F.4th 531, 536 (3d Cir. 2021) ("To survive summary judgment on a retaliation claim, a plaintiff must first make out a prima facie case." (citing Moore, 461 F.3d at 340)).

## IV.    CONCLUSION

For the foregoing reasons, we conclude that, even considering Plaintiff's untimely response, she has not met her burden of supporting a prima facie case of disability discrimination, age discrimination, or retaliation.    Accordingly, Defendant's motion for summary judgment is granted in full and judgment is entered in favor of Defendant and against Plaintiff.    An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

_____

John R. Padova, J.